**UNITED STATES of America**

v.

**Barry BICKMAN.**

**Crim. No. 80-122-1.**

United States District Court,
E. D. Pennsylvania.

Dec. 15, 1980.

Peter F. Vaira, U. S. Atty., Roberto Rivera–Soto, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

J. Shane Creamer, Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION

BECHTLE, District Judge.

Presently before the Court is the post-trial motion of defendant Barry Bickman ("Bickman") for a new trial or judgment of acquittal, raised pursuant to Fed.R.Crim.P. 29 and 33. For the following reasons, the Court, by Order dated November 6, 1980, denied the defendant's motion.

This case comes from an indictment charging violations of 18 U.S.C. §§ 1341 and 2 and consisting of eight counts of mail fraud and aiding and abetting. Those charges arose out of a series of events concerning the intentional watering-down of merchandise of the Arbill Industries, Inc. ("Arbill"), located in Philadelphia on April 14, 1975, in order to present fraudulent claims totaling approximately $64,000 to eight insurance carriers. Bickman was president of Arbill during all pertinent times and was charged with intentionally ordering other employees of Arbill to water-down Arbill goods that were not damaged by fire or water after a fire that occurred at a warehouse in Philadelphia because the goods were stored in other parts of the building. This was done to make it appear that the goods were actually damaged by the fire and would, therefore, justify, in the eyes of the insurance companies involved, the payment of the claims intended to be filed. Such claims were subsequently filed by Bickman through the use of the mails.

The case was tried before a jury commencing July 21, 1980, lasting five days and involving the presentation of several witnesses and the introduction of numerous exhibits. After deliberations, the jury returned a verdict of guilty against Bickman on all counts.

■ Bickman raises two major grounds in his post-trial motion. Each will be addressed separately. First, Bickman alleges that the Court erred in instructing the jury as to the defendant's recollection that the sole issue before the jury was whether or not the damage to the goods was caused by the fire or whether the damage to the goods was caused by the intentionally wetting-down of those goods by others upon the instruction of Bickman. Bickman alleges that the charge was in error because the Court failed to advise the jury of his defense that the goods were water damaged *after* the fire as a result of a breakdown of the sprinkler system on the floor in the warehouse where the goods were stored. Therefore, Bickman argues, the Court, through its charge, precluded the defendant from offering the defense that the goods were damaged as a result of a third alternative reason.

Bickman's recollection of the Court's charge is inaccurate. The Court did not instruct the jury that in order to find Bickman innocent they had to find that the damage to the goods was caused by the fire, thereby precluding Bickman of the defense that the goods were instead damaged by a sprinkler system breakdown in the warehouse shortly after the fire occurred. If the charge is examined carefully, it plainly and repeatedly shows that the jury was given, as an option to consider in arriving at its verdict, the defendant's theory. Relevant excerpts from the Court's charge to the jury that bear on the present issue are as follows:

And the reason the indictment is prepared this way is that the Government's contentions are that there was one scheme to defraud and that was the plan, alleges the Government, developed around the relocation of this merchandise and the intentional wetting it down so that then the gloves could be represented as having been damaged by reason of this fire.

And as we know, if there's a fire, most policies cover for water damage. These weren't burnt; it had to do with water damage. That's the principal plan.

N.T. 5–13.

And the defendant is charged with having [caused insurance proceeds checks based on proofs of loss to be mailed], with knowing that such proofs of loss were false and fraudulent when made, in that the proofs of loss stated that the loss for water damage was caused by a fire and not caused by the defendants and the other operating—you have heard the testimony—in the way that they did, and that it is also charged that the defendant knew that the others, Riley, MacClain and the other defendants named in this indictment, caused the insured merchandise to be water-damaged and it wasn't as a result of the fire.

N.T. 5–15 to 16.

First, whether there was an artifice or scheme to defraud intentionally formed and as alleged in this indictment to deceive insurance companies of money by means of a false and fraudulent misrepresentation *as to how this merchandise became water-damaged.*

N.T. 5–18 (emphasis supplied).

It will be up to you to determine—because a claim was made by reason of that merchandise—it will be up to you to determine whether or not the Government has shown beyond a reasonable doubt that this defendant, Barry Bickman, did willfully and knowingly associate himself and participate as a knowing actor in the scheme that brought about the presentation of the claims and the payment of the funds from the insurance company which can only be found if you find that in fact the merchandise was purposefully and intentionally wet-down as alleged by the Government.

*It is another way of saying if you find this merchandise was wet-down through some other means, then there is no scheme to defraud. There is nothing at all wrong with those papers filed with the insurance companies if the goods in fact were wet down by reason of some episode associated with the fire in the normal*

*course of events.* What makes them fraudulent and false, if they are, is that the merchandise represented by them was purposefully wet down for the purpose of deceiving the insurance company into thinking that a claim should be made under those policies that would pay if goods were wet down as a result of the fire and not purposefully by parties intending to recover.

N.T. 5–21 (emphasis supplied).

The law was not violated if the proofs of loss were not false in some substantial manner at the time of the mailing of the insurance proceeds check. *So the key is, it seems to me from an evidentiary viewpoint, you will have to determine how did the merchandise get wet?* If it was intentional and purposeful as outlined by the Government's witnesses, then that would be the beginning of the presentation of a false claim; if not, *if the evidence doesn't support that the goods were wet in that manner beyond a reasonable doubt, the defendant is entitled to be acquitted because if the goods presumably were wet in the normal course of these events,* the defendant would be entitled under the policies to make claim for the amount shown in the amount paid.

N.T. 5–22 to 23 (emphasis supplied).

In light of the total context of the Court's charge to the jury, Bickman's reliance upon the cases of *U. S. v. Benedetto,* 558 F.2d 171 (3d Cir. 1977), and *Lyons v. U. S.,* 325 F.2d 370 (9th Cir. 1963), is misplaced because the errors raised in those cases did not occur here.

The second major contention raised by Bickman in his post-trial motion is that the Court erred by permitting certain testimony of Lt. Frank Hahn ("Hahn") of the Detective Division of the Philadelphia District Attorney's Office. Hahn's testimony reveals that, more than three years after the fire involved in this case, he was contacted by Bickman concerning theft of goods from his companies which might have necessitated investigation. During the August, 1978, contact, Bickman made the following statements to Hahn:

Q  Now, during those times, did you have conversations with Mr. Bickman?

A  Yes.

Q  And during those conversations did Mr. Bickman ever raise any of the matters that are raised on that statement?

\*     \*     \*     \*     \*     \*

What were they?

A  The insurance claim four years ago.

Q  What did Mr. Bickman say about that?

A  I believe it was the time that Mr. Bickman was down in Customs and we were going over the case and Barry said something about he was a little afraid of Riley, what Riley could do.

And I asked the question—I am not—I say I asked it; one of us asked the question that was present—"Well, what would Riley have on you?"

And Barry mentioned an insurance claim, it was either three or four years ago, and he went on to say that there was a fire at the Glenwood warehouse in which there was water damage done to his goods and I believe he said the claim was settled for $97,000.

I asked Barry, "Did Riley receive any of the proceeds from the $97,000 claim?"

And Bickman said, "No."

He then spoke of a theft—

\*     \*     \*     \*     \*     \*

We asked: "Was there anything else?"

And Mr. Bickman said there was a theft of either Arbill-Robar goods from the platform of the warehouse, the Glenwood warehouse, and that I believe that claim was settled for $14,000.

And again I asked, "Did Riley receive any of those proceeds?"

And Bickman said, "No."

And he spoke of a third claim which was at—

\*     \*     \*     \*     \*     \*

Bickman spoke of a third claim which was a big fire at 42nd and Glenwood where I believe extensive damage happened there and the claim was settled for a couple hundred thousand dollars.

And again I asked, "Did Riley receive any of those proceeds?"

And he said, "No."

N.T. 3–129 to 131.

Bickman argues that the presentation of the above testimony was violative of Fed.R. Evid. 404(b), which provides:

> (b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Bickman contends that the above testimony of Lt. Hahn was more prejudicial than probative because it had the effect of drawing the forbidden inference that an individual who committed a fraudulent or criminal act on one prior occasion is likely to commit similar acts again. *See U. S. v. Long,* 574 F.2d 761, 766 (3d Cir. 1978). *See also U. S. v. Cook,* 538 F.2d 1000, 1003–1004 (3d Cir. 1976).

Rule 404(b) provides that discretion is granted to the trial judge in balancing the probative value versus the prejudicial value of certain testimony.[1] Bickman claims that the above testimony of Lt. Hahn was not probative at all. The Court disagrees.

■ Initially, the Court cannot agree that the testimony of Lt. Hahn concerning statements made to him by Bickman on a prior occasion is impermissibly or unduly prejudicial. The important consideration that must be kept in mind when determining whether testimony is prejudicial is that statements are only prejudicial if actually presented through testimony, argument or exhibits to the jury and, therefore, heard or perceived by the jury. Any undisclosed knowledge of counsel or the Court which goes beyond the plain meaning and natural inferences of the words cannot be relevant for purposes of showing prejudice under Rule 404. Simply put, the jury cannot be prejudiced by what they have not heard, seen or read during the course of the trial. Applying these very basic notions to the instant case, the objectionable testimony of Hahn can be distilled into the following points: (1) Bickman was "a little afraid" of Walter Riley ("Riley")[2] because of what Riley "could do" concerning something Riley "had on" Bickman; (2) Bickman had submitted three prior insurance claims involving either stolen or damaged goods of either Arbill Industries or Robar Industries; (3) the insurance claims for those prior losses were settled for varying sums; and, (4) Riley did not receive any of the proceeds from those insurance claims. [N.T. 3–130, 131.]

---

1. In regard to Rule 404(b), the notes of the Advisory Committee on the proposed rules provides:

    Subdivision (b) deals with a specialized but important application of the general rule excluding circumstantial use of character evidence. Consistently with that rule, evidence of other crimes, wrongs, or acts is not admissible to prove character as a basis for suggesting the inference that conduct on a particular occasion was in conformity with it. However, the evidence may be offered for another purpose, such as proof of motive, opportunity, and so on, which does not fall within the prohibition. In this situation the rule does not require that the evidence be excluded. No mechanical solution is offered. The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other factors appropriate for making decisions of this kind under Rule 403. Slough and Knightly, Other Vices, Other Crimes, 41 Iowa L.Rev. 325 (1956).

2. Riley was the Government's chief witness at trial to the fraudulent acts. During all pertinent times, he was the operations manager of Arbill and, on the date in question, he testified that he was ordered by Bickman to illegally water-down undamaged Arbill goods with the assistance of three other employees. He also testified that Bickman filled out the insurance claims and collected the proceeds from those fraudulent claims. Riley was granted immunity by the Government in exchange for his testimony.

The Court finds that this was all that was presented to the jury through the objected to testimony of Hahn. The three prior insurance claims, from the plain meaning of the testimony, concerned only legitimate claims filed in due course under standard damage policies, which were routinely settled with the insurance carriers by Bickman, the president of the company which suffered the loss. What Riley "had on" Bickman concerning the filing or settlement of those three claims is ambiguous at best in the context of the plain meaning of the testimony. This apparent ambiguity only serves to decrease the possible prejudicial effect the statements might have produced to *de minimis* proportions. Whatever independent and undisclosed knowledge counsel for the Government or the defense had of the undisclosed circumstances underlying those prior claims is irrelevant for purposes of Rule 404, because this knowledge was not imparted to the jury and, therefore, could not be prejudicial. Defense counsel stated to the Court at side-bar that Bickman was currently under criminal investigation by the United States Attorney's Office for two of those prior claims. However, this fact, if true, was not made known to the jury. Again, the jury cannot be prejudiced by facts or circumstances which they did not hear or perceive. *See* N.T. 3–131 to 133 (side-bar conference).

Second, whatever prejudicial effect might have been transmitted by inference to the jury, if any, it was effectively negated in the equitable balance by the probative value of the statements. The probative value of the statements can be discerned in the context of the general theme that was attempted to be created by Bickman throughout the trial—the theme being that the business relationship between Bickman and Riley, the Government's chief eyewitness to the fraudulent acts, was contrary to that testified to by Riley. Riley had testified in effect that Bickman was the dominant figure in their business relationship and that he (Riley), although production manager of Arbill, was very much under Bickman's control. Hence, the inference the Government attempted to draw through the testimony

of Riley was that when Bickman ordered Riley and others to illegally water-down undamaged goods, Bickman's position of control was perfectly consistent with the relationship that had existed up until that time between Bickman and Riley. The defense attempted to show, as it had the right to do through cross-examination of Riley, a different version of that relationship. This version was that Bickman was merely the inexperienced heir to a family business that had previously been run by his father and who, after inheriting that business, hired Riley, who was experienced, to manage and control the day-to-day business operations. [N.T. 2–66 to 69.] During his employ, the defense showed, Riley proceeded to gain control over the business and engaged in various illegal activities of which Bickman was not cognizant. Defense counsel characterized Riley on cross-examination as one who tried to "pull the wool" over the eyes of Bickman [N.T. 3–33] when he stole various goods from Bickman's business [N.T. 2–61, 110–127, 179; 3–33.], received kickbacks from vending machine suppliers servicing Bickman's warehouse [N.T. 2–77 to 78], received kickbacks from other suppliers [N.T. 2–75 to 76] and other similar acts of which Bickman was unaware. [N.T. 2–144 to 145; 3–24 to 26.]

The inference Bickman tried to develop, which was perfectly permissible, was that it would be totally out of character, based on the true relationship between Bickman and Riley, for Bickman to have allegedly ordered Riley to illegally water-down undamaged goods and for Riley to have readily complied at great risk to himself while only receiving his usual salary and nothing more for his illegal participation and with Bickman pocketing all of the proceeds. [N.T. 2–43.]

The Government, in an understandable attempt to rebut the defense's attempt at remaking the Bickman-Riley relationship, presented the testimony of Lt. Hahn. His testimony was intended to show that Bickman was truly the dominant figure in that relationship because he, and not Riley, had in the past received the full proceeds from

other insurance claims. The probative value of Bickman's statements to Hahn was not that the claims were made, but that Bickman, and not Riley, received the proceeds of those claims. The intended conclusion to be drawn was that it was not out of character for Bickman, as the controlling figure in the Bickman-Riley relationship, to have ordered Riley to commit illegal acts for which Bickman only would serve to profit to the total exclusion of Riley.

Admittedly, the probative value that can be attributed to the testimony at issue here is not overwhelming, but neither is the prejudicial effect that might have been generated. Therefore, on balance, each serves to effectively negate the other, leaving less than the quantum of unduly prejudicial effect that Rule 404 was designed to prohibit and which might warrant a new trial or judgment of acquittal.

Finally, and perhaps most importantly, whatever conclusions that could have been drawn by the jury from Lt. Hahn's testimony on direct examination must be considered with the content of his testimony on cross-examination. During cross-examination, counsel for Bickman asked the following questions of Hahn:

Q At 4:45 the same day on the 5th, Bickman told you, did he not, that Riley wants $15,000 or "he will put me in jail"?

A That's correct.

Q Now, he made that statement to you on that day and nonetheless he was in your office still complaining about the thefts and Riley, wasn't he?

A This is the conversation. You're talking about that particular day.

Q I am saying to you, sir, that that very day, the 5th of September of '78, he called you on the phone and told you that Riley said he wanted $15,000 or he will put Barry Bickman in jail. He told you that, didn't he?

A Yes.

N.T. 3–140 to 141.

The obvious effect of defense counsel's own elaboration on what Bickman told Hahn on a prior occasion only helped to clarify the until-then only ambiguous inference that the testimony of Hahn on direct might have produced. That clarification was that the "something" that Riley "had on" Bickman concerning the three prior insurance claims was something that would "put Barry Bickman in jail." Lt. Hahn did not volunteer this final clarification but rather defense counsel, by his leading question, invited the inference that defendant now complains of. This inference of possible criminal conduct by the defendant involving prior insurance claims was created solely by, and twice emphasized by, defense counsel and not the Government. Rule 404 was not intended to preclude prejudicial inferences being drawn from prior bad or criminal acts of the defendant *by* defendant himself through counsel, but only by the Government. Having in effect opened the last button of the theretofore slightly opened bag of prejudicial inference, defense counsel created the situation he so forcefully, but albeit prematurely, objected to during the Government's direct examination and for which the defendant cannot now complain under Rule 404.[3]

This Memorandum Opinion is in support of the Court's Order of November 6, 1980, which denied the defendant's post-trial motions.

---

**3.** The other contentions raised by the defendant in his post-trial motions are equally without merit—those being that the verdict was contrary to the weight of the evidence and was not supported by substantial evidence. The Government presented two eyewitnesses who testified that Bickman ordered them to illegally water-down undamaged Arbill goods and that Bickman filed fraudulent insurance claims for those goods and collected the proceeds. The defendant, along with presenting an alibi witness, also produced three witnesses who testified in substantial part that the goods were damaged due to a faulty sprinkler system after the fire occurred and were not intentionally watered-down as the Government contended. The issue then became one of credibility for the jury to decide as fact-finders. They chose, as reflected by the verdict, to credit the Government's witnesses' version of the event, which the Court finds to be supported by the evidence presented.